& Associates, Inc. v. Turner Construction, L.A. Mr. Kenney, you have reserved three minutes for rebuttal. So if that gives you seven now, you may proceed. Good morning, Your Honors. Thomas Kenney of Spiro-Harrison & Elson for Plaintiff Appellant, Nastasi & Associates. May it please the Court, The District Court order should be reversed because it erred in making impermissible credibility determinations at the summary judgment stage and failing to resolve ambiguities and draw all permissible inferences in favor of Nastasi, the non-moving party. If courts held all civilian plaintiffs to the standard which the District Court held Nastasi, they would never be able to bring claims for fraudulent schemes that are self-concealing in nature, as no typical plaintiff has the means or the access to uncover such fraud on its own. Defendants make much of the fact that Speak right up, Counsel, because you're a little hard to hear. Okay, move up the lectern. There you go. Hang it up. The black button. The court officer will help you out. Got it. Thank you. It says down up. That's very helpful. No, no, that's okay. That's okay. I want to hear you. That's why I asked. Appreciate that very much. Defendants make much of the fact that around this time frame, the 2010-2011 time frame, Nastasi was speaking to the District Attorney and in fact had entered a cooperation agreement with the District Attorney. That is true, but the information he was providing to the District Attorney was about completely unrelated matters, completely unrelated, completely different contractors. But I guess by 2015, it seems to me at the very latest, April 2015, he has advised that a bribe is the cost of doing business with Bloomberg and Turner. Explicitly, that's in the complaint. So by April of 2015, how is that not sufficient to put him on notice that this is a pay-to-play situation? Well, certainly at that point, he does begin to make inquiries to the best of his ability. Inquiries? He's told that a bribe is the cost of doing business. That's not inquiry notice. That is a crime, right? That's being told what you have to do. And he's already admitted that he knows that this is going on, that he's already surmised this earlier. But isn't that proof positive? That's confirmation of all his concerns from 2010? Well, I think I would disagree there to the extent he's admitted that he's aware of this scheme going on at the 120 Park Project, involving Bloomberg and Turner, for which several, numerous executives from Bloomberg and Turner were subsequently indicted. Well, he complained as early as July of 2011 in an email about the 120 Park Project and how he hadn't gotten the bids. He said things like, you guys have no problem getting Donaldson work, but when it comes to me, every job gets split. But yet when a tough job number comes along and goes to me, this is total BS. And then he goes on and complains and says that they're manipulating Donaldson's – they're leveling Donaldson's bids so Donaldson gets the work, which, of course, is problematic. So he's acutely aware of the problem. And then it's suggested two or four years later, well, you can take care of that problem if you bribe somebody. How does he not know? How does he not have the facts in front of him then that make out the possibility of the claim that he would allege with regard to the RICO claim he has? Well, again, he's been provided some information, but he's also consistently being assuaged. He's being provided reassurances by senior executives at Bloomberg and at Turner. But he's also made it clear that he doesn't believe those reassurances. Right. He says, frankly, this is bullshit. That's what he says. We don't talk that way around here at Western College. I'm sorry. I thought I was back up in Lavonia. Go ahead. Certainly. If you look at the chain of emails, yes, he's initially extremely upset. Then he receives assurances from a senior executive at Turner named Bert Romm who tells him, yeah, let's talk about this. Bert Romm provides explanations to him that Turner was just seeking to spread work around. Right, right. But he's already pulled – he's already stopped bidding for their work at that point, right? He's already said, I'm not doing this anymore. No, that – out of respect, that's incorrect. He continued bidding specifically on the 120 Park project through 2015. And he also continued doing other work for both Bloomberg and Turner through 2015. He was subcontracted to perform work on five different Turner projects throughout New York City for which – not for Bloomberg. But he also – But what's ambiguous about a bribe is the cost of doing business with Bloomberg and Turner. You've got to take care of Javier Polino in order to keep those jobs. Like that seems to be the smoking gun of smoking guns. Yes, Your Honor. At that point, he does begin to make inquiries. He does attempt to find out more information. But even at that point, simply stating that I was told secondhand that a bribe is the cost of doing business with Javier Polino doesn't come close. But I'm thinking about a different aspect of this case. Are you hearing me okay? I'm going to lean in very closely, Your Honor. I'll get as close as I can. Is this better like this? I think I can hear you. I'll let you know if there's any issue. So the district court dismissed your initial suit on the ground that it was the wrong party interest of plaintiffs because you had transferred all your assets to a trust, right? Then you filed a new suit in which you simply repeated, and I'm sorry, let me go back to you. And the district court relied on it, relied for making that judgment on the fact that you had said so. This court relied on a statement by you to the effect that all the assets had been transferred to the trust, which would mean that the trust was now the owner of this claim. Now, then you then proceed to file a new suit in which you repeat exactly the same claim for the benefit of the same plaintiffs. But you don't include, you don't bring to the district court any evidence to show that the same plaintiff is the proper party in interest. You simply assert in the complaint that it is the proper party interest, but with no evidence showing that. So the district court is left in the position where it is dismissed on the grounds that the wrong party interest is the case. Then you bring a new case brought on in the name of the same party with no evidence to support your proposition that this is in fact the correct party in interest. Okay. Thank you, Your Honor. Well, that's not an issue specifically on appeals. It wasn't part of the district court's grounds for dismissal on summary judgment. We did provide evidence that the statement in a complaint in a state court action that he had assigned all of his assets to the trust was incorrect. That, in fact, was not the case, and the Stasi and Associates was a proper party in interest. What evidence? What evidence? You said so. You said it was not correct, but I don't see that you provided evidence of the fact that the Stasi was the correct party in interest. And again, I'm sorry, since that wasn't an issue on this appeal, I don't have that specifically in front of me. It wasn't part of defendant's summary judgment motion, and it wasn't the grounds for defendant's dismissal. But I believe we provided evidence that that transfer of assets never occurred from the Stasi to the trust. All right. You've reserved three minutes for rebuttal, so we'll now hear from Mr. Curran. May it please the court. My name is Tom Curran. I represent Turner Construction Company. It's my privilege to address the court on behalf of all of the defendant appellees. The district court's order of summary judgment was that the correct decision here, based upon the clear and undisputed facts of this case. Those facts demonstrate that appellant and the Stasi and Associates initiated an action well beyond the four-year statute of limitations applicable to the federal antitrust and RICO causes of action. This case is about appellant's injury, when appellant knew about it, and when appellant knew about the conduct behind that. And in 2011, it is clear, based upon the appellant's own words through its principal, Anthony Nestazi, that the clear evidence on summary judgment shows that appellant knew about its injury, it knew about the conduct that had caused it, and it knew about these things no later than July of 2011. The undisputed facts on summary judgment establish, as the district court stated, that this action initiated in July of 2020 is presumptively time-barred. Moreover, there is no doctrine, no tolling doctrine, that serves the appellant to preserve their time-barred federal claims here. Fraudulent concealment is not availing, and there is no equitable estoppel theory that is applicable here. The undisputed facts in July of 2011, Mr. Nestazi is emailing Anthony Gazone, the principal Bloomberg construction executive, that he was the legitimate low bidder. He's telling in July of 2011 to Mr. Gazone that he's 0 for 3. He's lost the 3 bids submitted to that point. And that, quote, you can't tell me that someone isn't playing around. I've been in the game too long not to recognize the problem, again in 2011. Turner is being allowed to, quote, play games, and, quote, I know I'm not playing on a level playing field. Because, quote, been in this business way too long. Mr. Nestazi is not making inquiries. There's a red herring here about assurances that have been provided. No, that's when people ask, is this going on? Maybe that. I'm worried about such and such. But Mr. Nestazi is telling people, Mr. Gazone specifically, that he knows. And he receives no reassurance in 2011 other than Mr. Gazone stating in a conversation that they had, give me some reason to do something about this. Now, for someone who's been in the business way too long and knows about playing games, that's clearly a solicitation to abide. But in any case, it's certainly not any reassurance of any kind, and it's perverse to claim that it was. As to 2011, an email exchange with Bert Romm of Turner Construction, this isn't reassurance at all. Mr. Nestazi is complaining about losing bids. Mr. Romm says, well, when you're back from your vacation in Italy, I hope we can sit down and talk about it. That's not a reassuring statement under any cases, much less the cases that plaintiff cites. Specifically, hope is not a reassurance. There needs to be a discussion of exactly what the problem was, the likelihood of its recurrence, and what is going to be done about it. There's none of that here. In July of 2011, Nestazi exchanges emails with his own personnel in response to the manipulation. He states that Turner is manipulating bids. This is July of 2011. One of his personnel responds, it looks like this was set up from the start. Nestazi states, we lost Bloomberg again by 10,000. We were 20,000, 200,000 low, and yet Turner leveled Donaldson to 10,000 lower than us. And in July of 2011, Mr. Nestazi did tell his personnel, I just told Turner and Bloomberg to remove us from their bidding list, and I will no longer play the game. He knows the pay-to-play game. He's telling us. He's not asking if a pay-to-play game is going on here. He's telling people that I know that it is. There's no reassurances, as the law envisions those statements, when you are in possession of this kind of knowledge, as Mr. Nestazi in 2011 clearly makes it so. By 2015, after losing seven or eight bids, Mr. Nestazi runs in at the Havana Club, runs into appellant Faye Devlin of Eurotech. And Mr. Devlin states to Mr. Nestazi, hey, a bribe is the cost of doing business with Bloomberg, and you have to keep Javier Paulino, a Bloomberg construction executive, happy to keep these jobs. If there were any residual doubt by that— He says you have to keep him happy. He says you have to take care of him. Take care of him. It seems to be even more explicit. Apologies. So I think we get that point. I was wondering if you could talk a little bit about the sanctions, however. I mean, it's not a lengthy analysis in Judge Furman's order, and it seems that basically the prejudice is the cost of bringing the motion. That's really what he's finding. That's what the sanctions award is, right? I believe that is the sanctions award improperly tailored to that for the spoliation that had to be developed and then moved upon. And I think that the judge's sanctions in that regard were specifically tailored to the conduct before the court under the discretion provided under Rule 37. But the spoliation of evidence didn't preclude you from winning on a summary judgment motion. I'm sorry? The spoliation of evidence didn't preclude you from winning on a summary judgment motion. No. You weren't prejudiced in any way, were you? Well, actually, there wasn't a ruling of an adverse inference, because as the district court noted, since I'm issuing summary judgment, I'm not even going to go there. Right. But the cost of having to develop and move for the spoliation was a cost that the judge did award, and we thought that that was necessarily tailored and specific well within the discretion afforded the district court under Rule 37. But if that were the case, then, I mean, I guess conceivably, then any time you make a spoliation motion, you're getting damages, right? You're going to get awards. Well, it was specifically tailored by the judge to the cost of the motion. There was a lot of cost that went into chasing all the statements that Mr. Nastassi had made in various litigations all over the place, as the district court noted, a virtual storm of litigation in his life. And that had to be gathered, and there had to be a deposition of Mr. Nastassi, and they sat him down, and he was held to account for that. And the final version, such as it is, of his destruction of the e-mails in May of 2015 and then finishing it off by dumping everything else of Nastassi and Associates into a dumpster personally, that had to be developed. But the judge, as I understand, tailored the sanction to the cost of having to make the motion. Fraudulent concealment, Mr. Nastassi was never in ignorance, okay? Much less in any ignorance as a result of anybody on the other side of the caption here. Judge LaValle, are you there? Yes, I am. I thought we lost you for a second. Go ahead. Thank you. And much less was there any equitable estoppel. Equitable estoppel means the party seeking it needs to show diligence, and they need to show some extraordinary circumstance that got in their way or unfairly acted upon them. There's none of that here. None. He filed his suit. He sat after the 2015 conversation and after in 2011 telling everyone, I know, he waits to sue until the New Year's Eve on 2018, December 31st of 2018. That's action one. Now, we moved to dismiss that. Judge Furman told Nastassi and Associates, don't even reply to this. Amend your complaint. Part of our motion to dismiss was for standing. Amend your complaint. They ignore the standing issue entirely. They file an amended complaint not addressing standing. Again, no diligence in that. And we moved to dismiss, and that was granted. Right. And that comes up here. After reconsideration is denied, it comes here, Judge. We reversed because of the fact. You sent it back to say, does fund liquidation change your view at all? And Judge Furman said, well, not really. But in any case, under Rule 17, I'm dismissing because they haven't amended in a reasonable amount of time. Clear ruling. They filed an appeal on that dismissal. Right. And they, on their own motion, withdrew it. But had they amended? Had they amended to allege the real party in interest? Not in the first action. Had they done so? Just wait until I finish the question. Yes. You're all charged up here. I know. If they had done so, then it would have related back. I mean, they would have been able to use. That would have been the starting of determining whether their claim was timely. But they didn't do that. They didn't do it. They started a new action. Correct. If they didn't do that, they don't get to relate back. They certainly do not. And they abandoned the first action when they withdrew their own appeal. And they chose to proceed with the July of 2020. But arguably, the 2018 action, in your view, is not timely in any way. It's not timely in any event because Mr. Nastassi, he tells. He's not asking. He's not seeking reassurance. He's telling everyone about the information that he possesses. And in 2011, he possesses information about manipulation, changed bids, not a level playing field, play the game, the pay-to-play game. The statement that he made in March of 21, you know, he does. He says, I went in to teach the Manhattan DA's office about bribery and extortion and other crimes. He specifically mentions Turner and Bloomberg in that statement, by the way. But it doesn't matter. He tells Anthony Gazone, in July of 2011, I know what's going on. He tells his own employees that he knows that Turner is manipulating bids. That's when the clock for antitrust starts. He knows his injury, and he knows the conduct underlying the injury. That's when the conduct for civil RICO starts. He knows his injury. He's certainly on notice of it. And it's not required under the law that under the Koch case that he know the details of the pattern of the Constitution of the criminal enterprise. He knows there's a link to the conduct of others. He's telling Bloomberg is allowing Turner to do this. He says these things. All right. Thank you, Mr. Kern. We'll now hear from Mr. Kenney for three minutes of rebuttal. Thank you, Your Honors. I think it's important to emphasize the sequencing of the e-mails in 2018, in 2011, rather, where D'Souza, yes, he certainly does express anger and frustration about not being awarded work at the 120 Park project. But subsequent to that, he does receive reassurances from both Bloomberg executives and Turner executives. And more importantly, he continues to receive significant amount of work from both Bloomberg executives and Turner executives. He's awarded five separate subcontracts on Turner projects throughout New York City, and he also remains until 2015 to be the primary maintenance subcontract. When does he pull the plug on his company? 2015. And his actions started, the second action started 2020? That's correct. You got a four-year statute of limitations. That's correct. So when he pulls the plug on his company in 2015, that's what he does. He's attempting to work out his issues with Bloomberg and Turner. He's attempting to reach some sort of settlement. But he's still not aware of this wide-ranging scheme that was the subject of- There's an e-mail that he sends where he talks about, well, you know, he mentions Mayor Bloomberg. We ought to settle this. We ought to fix it. And it's all premised on the fact that the bids are rigged, isn't it? No, that's not correct. That's premised on the fact that he was terminated as the maintenance subcontractor at Bloomberg's headquarters at 731 Lexington Avenue. And he did, in fact, file a lawsuit in 2017, in April of 2017, in state court in Nassau- Yeah, but you haven't argued that stops the clock here. No, no, certainly not. But just to indicate what sort of knowledge and styles he had at the time that, you know, he was certainly attempting- You know, he filed a lawsuit. He certainly believed that something had gone on which led to him being terminated as the maintenance subcontractor at 731 Lexington Avenue. But he was not aware at all of this intricate, complicated scheme, bribery scheme led by Bloomberg and Turner executives to award work to certain- That's not what decides whether the clock runs or not, is it? Whether he's on inquiry notice that he's been had. And if he's on inquiry notice that he's been had, then he has an obligation to pursue it, doesn't he? Well, he's not on inquiry notice- He doesn't have to know all the parameters. He doesn't have to have all the information to allege his complaint for when the clock starts. It's when inquiry notice starts, right? Am I right about that? That's absolutely correct, Your Honor, yes. We agree on that. Yes, absolutely. And so then the question becomes, when is it, when is it, when is a reasonable person, because we measure it by a reasonable individual, not necessarily just him, but a reasonable individual, having the information they ask for, have an obligation to say, what is going on? Well, as- You tell me. Sure. You tell me when the clock starts, because your time's almost up. So leave me with that impression. In October of 2017, Bloomberg and Turner's offices were raided. Until that time, Bloomberg and Turner claimed they had no idea about this scheme. You know, they talk about distasteful experience in the construction industry. But Bloomberg and Turner themselves had no idea that certain senior executives were accepting bribes and had this complicated scheme that would become the subject of the indictments a year later, you know, to essentially steal from them. So only- The far back I think you can go is October of 2017. Then, yes, word begins to spread throughout the construction industry. There's, you know, there's newspaper news accounts of it. But it's really only when the indictments themselves come out in 2018 is Anastasia aware of facts that would have any chance of surviving a motion to dismiss. The defendants argued vigorously in their motion to dismiss that we hadn't alleged specific- Even with the benefit of the indictments, which Judge Furman found in denying their initial motion to dismiss in this case, that even with the benefit of the indictments, that we still hadn't sufficiently alleged facts to make out our antitrust and RICO claims. All right. Thank you both. Thank you very much. Reserved decision. Thank you very much.